UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
In re:                                          :
                                                :
                                                :      Chapter 11
                                                :      Case Nos. 02-21821-jf
             SUDANO, INC., *et al.*,            :               02-22350-jf
                                                :               02-22714-jf
                                                :
                                                :      (Jointly Administered)
                                                :
                                                :
                     Debtors.                   :
                                                :
-------------------------------------------------------------X

## DECISION DENYING MOTION SEEKING DAMAGES AGAINST TRUSTEE

APPEARANCES:

Janice B. Grubin                      Kristin K. Going, Esq.
Drinker Biddle & Reath LLP            Drinker Biddle & Reath LLP
140 Broadway                         1500 K Street, N.W.
New York, New York 10005-1116        Suite 1100
Chapter 11 Trustee                   Washington, D.C. 20005-1209
                                     Counsel for the Chapter 11 Trustee


Brian Hufnagel, Esq.                 Gary R. von Stange, Esq.
Office of the United States Trustee  Wormser, Kiely, Galef & Jacobs
271 Cadman Plaza East                825 Third Avenue
Suite 4529                           New York, New York 10022
Brooklyn, New York 11201             Former Counsel for the Chapter 11 Trustee
Trial Attorney

Sebastian G. Bongiovanni, Jr.
2453 East 3rd Street
Brooklyn, New York 11223

JEROME FELLER
United States Bankruptcy Judge

I.    **Introduction and Summary**

The above-captioned consolidated Chapter 11 cases, which were filed in the fall

of 2002, involve three closely-held real estate corporations, i.e., Sudano, Inc. ("Sudano"),

Sortino Realty Corp. ("Sortino") and Couva Associates, Ltd. ("Couva") (collectively, the

"Debtors").  The primary assets of the Debtors were three residential apartment buildings

located in Brooklyn, New York (collectively, the "Properties"), with each corporation

owning one of the buildings.  Sebastian Bongiovanni, Sr. ("Bongiovanni Sr.") was the

founder, owner, president and pilot of the Debtors.  Bongiovanni Sr. died on July 22,

2006 and is survived by his wife of more than 42 years, Mildred Bongiovanni ("Mrs.

Bongiovanni"), and a son, Sebastian G. Bongiovanni, Jr. ("Bongiovanni Jr.").

Under the continued stewardship of Bongiovanni Sr. in these Chapter 11 cases,

the Debtors operated their business and managed the Properties as debtors in possession

for about 18 months.  The Debtors were poorly managed and in aggravated financial

distress due, in large part, to a lack of sound business and operational controls.  Books

and records were in disarray.  Timely, proper, and accurate monthly operating reports

were not being filed.  The Chapter 11 cases were languishing with no end in sight.  The

Court granted a motion of GMAC Commercial Mortgage Corporation ("GMAC"), the

Debtors' largest creditor and holder of a consolidated mortgage on the Properties, for the

appointment of a Chapter 11 Trustee.  In March 2004, Janice B. Grubin was appointed

Chapter 11 Trustee ("Trustee").

The Trustee embarked upon a tripartite program of i) stabilizing operations, which

included addressing the neglected condition of the Properties; ii) establishing and

maintaining bankruptcy compliance; and iii) establishing and implementing a Chapter 11

exit strategy.  Much effort and monies were expended on necessary repairs, renovations and improvements of the Properties.  A reputable real estate broker was employed to assist in a sale of the Properties.  The Properties were marketed and sold, with Court approval, in June 2005 by the Trustee for sums far in excess of their scheduled and appraised values.  The Trustee negotiated a favorable settlement of the GMAC claim, which was approved by the Court also in June 2005.  Following the sale of the Properties and settlement with GMAC, the Trustee proceeded to file a disclosure statement and a joint plan of liquidation ("Plan").  In August 2005, upon Court approval of the disclosure statement and the requisite solicitation of acceptances, the Plan was confirmed.  The Plan did not provide for shareholder participation and extinguished the interests of shareholders.  Subsequent to confirmation of the Plan, the Trustee and the approved professionals she employed filed applications for compensation.  In November 2005, the Court granted final compensation and reimbursement of expenses to the Trustee and her professionals.

The Debtors and Bongiovanni Sr. were represented by, according to the Court's tally, some seven different law firms at various times.  Bongiovanni Sr. was an active participant in all aspects of these Chapter 11 cases.  He received notice of all hearings, was served with all papers, and vigorously opposed, among other things, the appointment of a Chapter 11 trustee, the Trustee's sale of the Properties, the Trustee's settlement with GMAC and the fee requests of the Trustee and her professionals.

Before the Court is a motion filed by Bongiovanni Jr. in January 2008, more than 2 ½ years after the sale of the Properties and Plan confirmation, on behalf of Mrs. Bongiovanni, alleging that she is a 50% shareholder of the Debtors and seeking

compensatory and punitive damages against the Trustee ("Motion").  Bongiovanni Jr., an

individual who is not an attorney, filed and prosecuted the Motion on behalf of Mrs.

Bongiovanni under a power of attorney given to him by Mrs. Bongiovanni, his mother.

The Motion and other papers filed in support of the Motion are confusing, rambling and

barely comprehensible.  In essence, Bongiovanni Jr. accuses the Trustee of depriving

Mrs. Bongiovanni of her constitutional rights of due process by failing to give her notice

and seeks damages for alleged wrongful conduct of the Trustee in her administration of

the Debtors' affairs.  The Trustee, the Trustee's former counsel and the United States

Trustee filed objections to the Motion and Bongiovanni Jr. filed a response to those

objections.  An evidentiary hearing was held on March 6, 2008 ("Evidentiary Hearing").

Post-Evidentiary Hearing submissions were filed by Bongiovanni Jr. and all the opposing

parties.  In addition, Bongiovanni Jr. filed a response to the post-Evidentiary Hearing

papers filed by the Trustee, the Trustee's former counsel and the United States Trustee.

Upon review and consideration of the record of these Chapter 11 cases, the

Motion, all pre and post-Evidentiary Hearing submissions, the transcript of the

Evidentiary Hearing and for the reasons hereinafter set forth, we conclude that: i)

standing to bring the Motion was absent; ii) there were no violations of due process; and

iii) no damages were proven or remotely warranted.  Accordingly, the Motion is denied

in its entirety.

## II.    **Background** [1]

Some framework or backdrop is necessary to place the Motion in proper context.

---

[1] The contents of this section of the decision are derived primarily from the Trustee's detailed report of her investigation, supported by many exhibits, styled "Interim Trustee Report Pursuant to 11 U.S.C. § 1106(a)(3) and (4)" (ECF Docket No. 119) and the disclosure statement she filed in connection with the Plan, styled "Disclosure Statement for the Trustee's Joint Plan of Liquidation" (ECF Docket No. 186).

A.    **The Properties**

Sudano owned an apartment building located at 2110 Westbury Court, Brooklyn, New York.  This building, which was built around 1929, is a six story, 95 unit, elevator residential building consisting of 23 studio apartments, 55 one-bedroom apartments, 17 three-bedroom apartments and 7 commercial units.  Couva owned an apartment building located at 2100 Westbury Court, Brooklyn, New York.  This building, which was also built around 1929, is a six story, 78 unit, elevator residential apartment building consisting of 54 one-bedroom apartments, 18 two-bedroom apartments and 6 three-bedroom apartments.  Sortino owned an apartment building located at 3506 Newkirk Avenue, Brooklyn, New York.  This building, which was built around 1932, is a four story, 29 unit, walk-up residential apartment building.  There are a total of 130 rooms comprising Sortino's 29 apartments.  In the aggregate, the Properties contain over 200 residential and 7 commercial units.

B.    **The Chapter 11 Filings**

On or about July 21, 2000, the Debtors, through Bongiovanni Sr., executed and delivered to GMAC a consolidated note under which the Debtors borrowed the sum of $4,975,000 at 8.5% interest per annum.  To secure the Debtors' obligations under the note, the Debtors, through Bongiovanni Sr., executed and delivered to GMAC a consolidated mortgage on the Properties.  The Debtors first defaulted under the terms of the loan by failing to make the payment due on October 1, 2001.  Upon the Debtors' failure to cure their defaults, GMAC commenced a foreclosure action on August 9, 2002 in the Supreme Court of the State of New York, Kings County, against the Debtors.  Seeking to prevent the foreclosures by GMAC and a court-appointed receiver from taking possession and operating the Properties, Sudano, Sortino and Couva

commenced these Chapter 11 cases by filing voluntary petitions for relief on September 18, 2002, September 30, 2002 and October 8, 2002, respectively.  Thus, the Debtors, through Bongiovanni Sr., were able to remain in possession and management of the Properties pursuant to 11 U.S.C. §§ 1107 and 1108.

Each Chapter 11 petition filed by the Debtors, all of which were signed by Bongiovanni Sr. under penalty of perjury, state that Bongiovanni Sr. was the sole shareholder of each of the three Debtors.[2]  Bongiovanni Sr. reiterated his 100% ownership in sworn Statements of Financial Affairs,[3] in sworn testimony at the Section 341 meeting of creditors presided over by the United States Trustee,[4] and in a disclosure statement filed in connection with a plan of reorganization filed by the Debtors.[5]

The Chapter 11 cases floundered for close to a year when the United States Trustee moved, on August 8, 2003, to dismiss or convert the cases to Chapter 7 on the grounds that, i) they were bad faith filings; ii) the Debtors failed to file operating reports; and iii) the Debtors failed to pay quarterly fees on a timely basis.[6]  The Debtors opposed the motion.[7]  The motion of the United States Trustee was adjourned from time to time in the hope that the Debtors would straighten out their affairs and was, in effect, superseded and withdrawn ultimately as a result of GMAC's motion to appoint a Chapter 11 trustee.

### C.    Trustee Appointment

On January 30, 2004, GMAC filed a motion seeking the appointment of a

---

[2] Lists of Equity Security Holders filed as part of each Chapter 11 petition.  Case No. 02-21821 (Sudano), ECF Docket No.1; Case No. 02-22350 (Sortino), ECF Docket No. 1; and Case No. 02-22714 (Couva), ECF Docket No.1.
[3] ECF Docket No. 109, part 2 at 9, part 4 at 8, part 6 at 8.
[4] ECF Docket No. 346 at 7.
[5] ECF Docket No. 70 at 37.
[6] ECF Docket No. 43.
[7] ECF Docket No. 46.

Chapter 11 trustee pursuant to 11 U.S.C. §1104.[8]  The Debtors filed opposition.[9]  On

February 12, 2004, a hearing was held at which the Court granted GMAC's motion,

finding cause for the appointment of a trustee, including i) the Chapter 11 cases were at a

standstill; ii) breach by the Debtors of a "so ordered" cash collateral stipulation; iii) late

payments to GMAC; iv) failure to file operating reports; and v) failure to pay

administrative expenses.[10]  An order granting GMAC's motion and directing the United

States Trustee to appoint a trustee was entered on March 3, 2004.[11]  On March 8, 2004,

the Court approved the appointment of Janice B. Grubin as Chapter 11 trustee.[12]  The

following day, the Trustee assumed the duties and responsibilities of operating the

business of the Debtors and managing their Properties.

Efforts of the Trustee to enlist the assistance of Bongiovanni Sr. proved futile.

The Trustee, after interviewing a number of property management companies, retained

Arco Management Corporation as her property manager.  The Trustee soon discovered

that the Properties were in deplorable condition, caused primarily by deferred or no

maintenance.  Moreover, many of these conditions raised serious health and safety issues.

The most pressing problems confronting the Trustee regarding the Properties

included i) faulty and hazardous elevators at the Sudano and Couva buildings which

posed a serious risk of injury or death; ii) flawed, illegal and inadequate wiring in the

basements of the buildings; iii) boilers in a state of dysfunction, unable to provide

consistent heat or hot water; iv) unsafe and hazardous sidewalk vaults and fire escapes; v)

---

[8] ECF Docket No. 72.
[9] ECF Docket No. 75.
[10] Transcript of hearing held on February 12, 2004 – ECF Docket No. 83.
[11] ECF Docket No. 78.
[12] ECF Docket No. 80.

inoperable fire extinguishers and smoke detectors; vi) leaking roofs and pipes; vii) broken windows and lights; and viii) rat, mouse and roach infestations.

Furthermore, the Properties were beset with widespread violations of the New York City Housing Code.  Housing violations in New York City are designated "A" (non-hazardous - to be abated in 90 days); "B" (hazardous - to be abated in 30 days); and "C" (immediately hazardous – to be abated in 24 hours).  As of August 2004, i) the Sudano building had 858 violations of record, comprised of 106 "A" violations, 561 "B" violations and 191 "C" violations; ii) the Sortino building had 476 violations of record, comprised of 59 "A" violations, 335 "B" violations and 82 "C" violations; and iii) the Couva building had 708 violations of record comprised of 100 "A" violations, 444 "B" violations and 164 "C" violations.  In sum, the Properties had over 2000 New York City Housing Code violations.

The Trustee launched an intensive and thorough restoration program to remediate, fix and improve the Properties.  With the assistance of professionals she employed in the ordinary course of business and, where required, with court approval after notice and a hearing, and with GMAC's consent to use cash collateral and post-petition financing obtained from GMAC, the Trustee took corrective measures.  The repairs and improvements effectuated by the Trustee included matters such as replacing all four elevators in the Sudano and Couva buildings, repairing the fire escapes, sidewalk vaults, roofs, plumbing, electrical and boiler systems and otherwise striving to bring the Properties into compliance with the New York City Housing Code.

Upon her appointment, the Trustee also discovered that the books and records provided by Bongiovanni Sr. on behalf of the Debtors were inadequate, incomplete and

contained numerous errors and omissions.  As for the Debtors operating reports while under the control and management of Bongiovanni Sr., they were either inadequate or not filed.

Another serious issue encountered by the Trustee was the unexpected cancellation of the Debtors' general liability insurance.  The insurance carrier claimed that it cancelled the Debtors' policies in early April 2004 because, after it provided Bongiovanni Sr. with notice that he must correct certain items, Bongiovanni Sr. provided false written assurance that such work had been completed.  The insurance carrier reported that when it sent a representative to investigate the claimed repairs, the representative found the claims of Bongiovanni Sr. to be false and that the repairs were non-existent.

## D.    Sale of The Properties

By the summer of 2004, the Trustee concluded that, in order to fulfill her duties under 11 U.S.C. § 1106(a) and in the exercise of her business judgment, the Properties be sold and that a well qualified real estate broker familiar with the relevant local real estate market be retained so that the estates might receive the highest and best offers.  After interviewing five real estate brokers, the Trustee selected Masey Knakel Realty Services, Inc. ("Massey Knakel").  Application was made to the Court and an order was entered authorizing the engagement of Massey Knakel as real estate broker.[13]

Upon determining that the Properties should be sold, it was necessary to determine a proper sales price.  According to appraisals as of February 24, 2000, the combined value of the Properties totaled $6.8 million.  According to the Debtors' schedules, the combined value of the Properties was $10 million at the time of the

---

[13] ECF Docket Nos. 122 and 123.

Chapter 11 filings in the fall of 2002.  According to Weiser Realty Advisors LLC, the Trustee's Court-appointed appraiser, the combined value of the Properties as of May 18, 2004 was $10.9 million.

The first preliminary offers that the Trustee received for the Properties were in the $8 million - $9 million range.  The first offer she received from a credible potential purchaser was for $9 million, but included certain contingencies that would have unacceptable additional costs.  The Trustee believed that a proper marketing and sales program for the Properties should not only generate a higher sales price, but also a reputable purchaser with proven operational and management experience.

Mid-September 2004 marked the start of an exhaustive marketing and sales effort by the Trustee through Massey Knakel that lasted for about five months.  Widely distributed flyers advertising the Properties, large "For Sale" signs posted on the buildings, advertisements in newspapers, listings on the Massey Knakel website, substantial marketing brochures, showing the Properties and negotiating with potential purchasers all highlighted the marketing and sales effort.  During this time and prior thereto, the Trustee continued to stabilize operations and management, ameliorate the state of the Debtors' books and records, investigate and authorize necessary repairs and renovate and remediate the Properties.  The result was a noticeable and marked increase in the value of the Properties.

On February 9, 2005, the Trustee entered into an agreement of sale for the Properties to MSK3 LLC for a purchase price of $13.1 million, plus an additional $400,000 to be held in escrow for repairs and remediation of violations.  On April 18, 2005, the Trustee filed a motion to sell the Properties to MSK3 LLC for $13.1 million,

plus the additional $400,000 to be held in escrow ("Sale Motion").[14]  Bongiovanni Sr.

objected to the Sale Motion.[15]  The Sale Motion and the objection of Bongiovanni Sr.

were heard by the Court on May 18, 2005.  The Court overruled the objection of

Bongiovanni Sr. and granted the Sale Motion at the hearing.  An order authorizing the

sale was entered on May 27, 2005.[16]  The closing occurred on June 16, 2005.

### E.      The Joint Plan of Liquidation

On May 26, 2005, the Trustee filed a motion seeking approval of a global

settlement with GMAC resolving, among other things, GMAC's amended proofs of

claims, post-petition financing obtained from GMAC and an adversary proceeding filed

against GMAC by the Debtors in February 2004.[17]  The settlement included a

compromise by GMAC of its claims of $8.5 million, whereby GMAC agreed to accept a

reduction of approximately $630,000.  A hearing on the motion was held on June 7,

2005, at which time the Court approved the settlement over the objections of

Bongiovanni Sr. and entered an order to that effect.[18]  An appeal by Bongiovanni Sr. to

the district court of the order approving the stipulation of settlement with GMAC was

dismissed on August 2, 2005.[19]

Having closed on the sale of the Properties and resolved the quantum of

GMAC's claims, the Trustee filed the Plan and accompanying disclosure statement on

July 7, 2005.[20]  The disclosure statement was approved on July 19, 2005[21] and the Plan

---

[14] ECF Docket No. 155.
[15] ECF Docket No. 157.
[16] ECF Docket No. 172.
[17] ECF Docket No. 171.
[18] ECF Docket No. 176.
[19] ECF Docket No. 204.
[20] ECF Docket Nos. 185 and 186.
[21] ECF Docket No. 196.

was confirmed on August 17, 2005.[22]  The Plan contemplated the payment of administrative expenses, and pre and post-petition creditors from the sale proceeds of the Properties.  However, since the Debtors were insolvent, shareholders were to receive no distribution under the Plan and their interests were cancelled.[23]

### III.    The Surfacing of Sebastian Bongiovanni Jr. and Mildred Bongiovanni

Until 1992, Mrs. Bongiovanni was involved in the affairs of the Debtors.  She took care of the "treasury area," depositing rents brought in by her husband, Bongiovanni Sr., and supervised landlord-tenant actions for non-payment of rent.  Subsequent to 1992, Mrs. Bongiovanni withdrew from any involvement with or monitoring of the Debtors, relying fully upon Bongiovanni Sr.'s handling of the Debtors' affairs and his representations as to their operations.[24]

Having concluded the claims resolution process and otherwise completed the administration of these Chapter 11 cases, the Trustee filed her final report on November 27, 2007 ("Final Report").[25]  At this point of time, Bongiovanni Jr. and Mrs. Bongiovanni, his mother, appeared for the first time.  On behalf of his mother, Bongiovanni Jr. filed a two-part objection to the Final Report.[26]  When Bongiovanni Jr. realized that an objection to the Final Report was not the right vehicle to recoup the lost fortune of the Bongiovanni family, he withdrew the objection to the Final Report without prejudice to seeking damages.[27]

---

[22] ECF Docket No. 206.
[23] Section 5.4.2 of the Plan provides that, "All Allowed Interests shall be deemed cancelled, terminated, and extinguished as of the Effective Date [of the Plan]."  Plan – ECF Docket No. 185 at 11.
[24] ECF Docket No. 352 at 33, 54-57 (Transcript of Evidentiary Hearing held on March 6, 2008) (hereinafter "Tr. at ___).
[25] ECF Docket No. 317.
[26] ECF Docket Nos. 320 and 321.
[27] ECF Docket No. 341 (Agreed order withdrawing objection to Final Report).

On January 28, 2008, Bongiovanni Jr. filed the Motion now pending before the Court on behalf of Mrs. Bongiovanni.[28]  The Motion, which is unpaginated, alleges that Mrs. Bongiovanni is a 50% shareholder of the Debtors who was deprived of due process because the Trustee failed to give her any notice in these Chapter 11 cases.  Bongiovanni Jr. insists that the Properties should have been sold by the Trustee at a good price soon after her appointment on an "as is basis," without addressing the neglected condition of the Properties.  Such an expedited sale, he asserts, would have saved millions in repair costs and reduced trustee and trustee attorney fees, thereby allowing for a distribution to shareholders.  Bongiovanni Jr. seeks compensatory and punitive damages to be paid from any residual funds remaining in the estates and the forfeiture of all compensation awarded the Trustee and her former counsel.  The following language of the Motion reflects a sampling thrust of Bongiovanni Jr.'s criticisms:

> Throughout the tenure of the trustee **AT NO TIME** did she contact Mildred Bongiovanni and allow her Due Process: The trustee never verified who the shareholder were [sic], never identified board members and never even bothered to order the cooperate [sic] document. [Emphasis in original].
>
> • • • •
>
> It is Sebastian Jr. [sic] belief that the main reason the trustee did not accept these offer [sic] was because, at that time, her fees were minimal.  There can not be a business reason why the trustee would not sell the properties at that time.
>
> • • • •
>
> Clearly the trustee is a bright intelligent lawyer who has worked in the bankruptcy Courts for many years.  Clearly she knew that the longer she stays [sic] holding the properties the more fees' [sic] she can ring up.
>
> Had Mildred Bongiovanni been properly notified and become aware of the situation there is know [sic]

---

[28] ECF Docket No. 336.

> doubt in my mind the end result would have been
> completely different.
>
> • • • •
>
> Had Mildred Bongiovanni been properly notified she
> could have used her influence to sell the properties well
> before this got out of hand.[29]

Although the Motion does not quantify the damages sought, a later document filed by Bongiovanni Jr. requests $1,734,000 to be awarded to Mrs. Bongiovanni, plus $400,000 in punitive damages.[30]

## IV.    **Standing**

Bongiovanni Jr. is not listed in the Debtors' schedules as a creditor or equity security holder.  Nor has he filed a proof of claim in any of the Debtors' Chapter 11 cases.  Bongiovanni Jr. has never suggested that he is asserting his personal interest and bringing the Motion on his own behalf.  The Motion was filed and prosecuted by Bongiovanni Jr. on behalf of Mrs. Bongiovanni.  As such, Bongiovanni Jr. lacks the capacity or status to obtain relief.

An individual may proceed in civil actions in federal court either *pro se* or by an attorney.  28 U.S.C. § 1654 ("In all courts of the United States the parties may plead and conduct their own cases personally or by counsel ….")  An individual has a right to litigate *pro se* in the federal court, but if the individual has representation, it may not be by a person who is not an attorney.  *Iannaccone v. Law*, 142 F.3d 553, 558 (2d Cir. 1998) ("[B]ecause *pro se* means to appear for one's self, a person [i.e., a non-attorney] may not appear on another person's behalf in the other's cause."); *Pridgen v. Andresen*, 113 F.3d

---

[29] ECF Docket No. 336.
[30] ECF Docket No. 351.

391, 393 (2d Cir. 1997) ("[A] person [i.e., a non-attorney] ordinarily may not appear pro se in the cause of another person or entity.")

Bongiovanni Jr. has never been admitted or authorized to practice law in New York or any other state.[31] Bongiovanni Jr. is not an attorney and does not profess to be one.[32] Nonetheless, he filed and prosecuted the Motion before this Court by way of, among other things, conducting discovery, preparing legal memorandum, making oral legal arguments, examining and cross-examining witnesses, and introducing evidence on behalf of Mrs. Bongiovanni, all while lacking the capacity to obtain the relief he sought.

The fact that Mrs. Bongiovanni granted Bongiovanni Jr. a power of attorney did not authorize him to act as her counsel. Fed. R. Bankr. P. 9010 does authorize a designation of authorized agents, attorneys in fact or proxies in bankruptcy cases, with the proviso that they may "perform any act not constituting the practice of law …." Fed. R. Bankr. P. 9010(a). Consistent with Fed. R. Bankr. P. 9010(a), the power of attorney granted Bongiovanni Jr. was a general power of attorney, an Official Form 11A, under which Mrs. Bongiovanni authorized him "to perform any act not constituting the practice of law for the undersigned in all matters arising in this case."[33]

The power of attorney did not arm Bongiovanni Jr. with a license to practice law. It is well settled in both the federal and New York State courts that a power of attorney may not be construed to evade prohibitions against the unauthorized practice of law. *Powerserve Int'l., Inc. v. Lavi*, 239 F.3d 508, 514 (2d Cir. 2001); *DePonceau v. Pataki*,

---

[31] New York law prohibits anyone other than a duly licensed attorney from representing another person in a court proceeding. *See* N.Y. Judiciary Law §§ 478, 485 (McKinney's 2005). All other states have similar statutes.

[32] Bongiovanni has described himself as a 37 year old investment banker who between the ages of 18 to 28 worked in building management. ECF Docket No. 331 at 3-4 (Transcript of hearing held on December 18, 2007).

[33] ECF Docket No. 339.

315 F. Supp 2d 338, 341-42 (W.D.N.Y. 2004); *In re Steyne*, 1998 WL 34020729, at *2

(Bankr. D. S.C. Feb. 17, 1998); *People ex rel. Field v. Cronshaw*, 526 N.Y.S.2d 579

(N.Y. App. Div. 1988); *Estate of Friedman*, 482 N.Y.S.2d 686 (N.Y. Sur. Ct. 1984). One

state court best summed it up as follows:

> To construe a power of attorney so as to permit
> a nonattorney to appear and represent a principal
> in a court of record would be to permit the licensing
> and admission requirements to be circumvented. Such
> a result would be violative of public policy.

*Stokes v. Vill. of Wurtsboro*, 474 N.Y.S.2d 660, 661 (N.Y. Sup. Ct. 1984).

Nor would Mrs. Bongiovanni have standing to bring the Motion on her own

behalf. Bongiovanni Jr. predicates his mother's standing on her alleged status as a 50%

shareholder of the Debtors by virtue of her marriage to Bongiovanni Sr. To support this

contention, Bongiovanni Jr. argues as follows:

> Pursuant to the Uniform Marital Property Act
> W.S.A. 766.31 which is a Federal law that states;
> All property purchased during the coarse [sic] of a
> marriage is considered Marital Property and as
> such each person maintains half interest in the
> property.[34]

Bongiovanni is wrong. The statute referenced is a Wisconsin statute and not a federal

law. In any event, Wisconsin is a community property state; while New York is an

equitable distribution state.[35]

No documentation or other evidence was produced to support Mrs.

Bongiovanni's asserted shareholder interests in Sudano or Couva. At the Evidentiary

---

[34] ECF Docket No. 351.

[35] To the extent that Bongiovanni Jr. asserts that Mrs. Bongiovanni received an ownership interest in the Debtors after Bongiovanni Sr.'s death through interstate succession or through last will and testament, we note that Bongiovanni Sr.'s interests in the Debtors were extinguished in 2004, two years prior to his death in 2006.

Hearing, Bongiovanni Jr. produced a 100 share Sortino stock certificate in Mrs. Bongiovanni's name, which certificate represented 50% of Sortino's outstanding shares. However, these shares were cancelled upon confirmation of the Plan in 2004, long before filing of the Motion in 2008.

**V.      Due Process**

The Fifth Amendment to the United States Constitution provides that "[n]o person shall … be deprived … of … property, without due process of law."  U.S. Const. Amend V.  Due Process requires, "notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections."  *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950).

For notice purposes bankruptcy law divides interested parties into two types, "known" and "unknown."  *See Chemetron Corp. v. Jones*, 72 F.3d 341, 346 (3d Cir. 1995).  Those interested parties who are known must be provided express or direct notice, usually in writing.  The type of notice that is reasonable or adequate for purposes of satisfying the due process requirement of interested parties who are unknown turns on the facts and circumstances of the particular case.

As characterized by the Supreme Court, a "known" person is one whose identity is either known or "reasonably ascertainable."  *See Tulsa Prof'l Collection Servs., Inc. v. Pope*, 485 U.S. 478, 490 (1988).  An individual is reasonably ascertainable if the person can be identified through "reasonably diligent efforts."  *See Mennonite Bd. of Missions v. Adams*, 462 U.S. 791, 798 n.4 (1983).  Reasonable diligence does not require "impracticable and extended searches … in the name of due process."  *Mullane*, 339 U.S.

at 317-18.  The requisite search focuses on a debtor's books and records and, in general,

efforts beyond a careful examination of these documents are not required.  *See*

*Chemetron*, 72 F.3d at 347; *Zurich Am. Ins. Co. v. Tessler (In re J.A. Jones, Inc.)*, 492

F.3d 242, 251 (4th Cir. 2007).

The Trustee provided notice to interested parties in conformity with the

requirements of the Bankruptcy Rules and therefore complied with constitutional due

process requirements.  Fed. R. Bankr. P. 2002(d)(1) requires notice to equity security

holders of, among other things, i) the order for relief, ii) the hearing on a proposed sale of

all or substantially all of a debtor's assets; iii) the time fixed for filing objections to and

the hearing to consider approval of a disclosure statement; and iv) the time fixed for

filing objections to the hearing to consider confirmation of the plan.  In the absence of a

proof of interest filed by an equity security holder that provides a specific address for

service, notice to equity security holders should be sent to the address shown on the list

of equity security holders.  Fed. R. Bankr. P. 2002(g)(1) and (3).

Under oath and otherwise, throughout these Chapter 11 cases, Bongiovanni Sr.

represented that he is the sole shareholder of the Debtors.  The Trustee repeatedly sought

the books and records of the Debtors.  The books and records, to the extent produced by

Bongiovanni Sr., were diligently reviewed by the Trustee.  They provided no information

to the Trustee that would indicate the existence of any other shareholders.  Furthermore,

the Debtors were closely-held, private corporations and thus there was no publicly

available information listing their shareholders.  Due process does not require the Trustee

to be clairvoyant.  In light of Bongiovanni Sr.'s representations and her review of the

Debtors' books and records, the Trustee had no reason to believe that Mrs. Bongiovanni

was a shareholder of any of the Debtors. Her status as a shareholder was not reasonably ascertainable. Accordingly, to the extent that Mrs. Bongiovanni was a shareholder, she must be categorized as an unknown shareholder for notice purposes.

No proof of interest was filed in these Chapter 11 cases by any shareholder. The list of equity security holders filed in each of these cases designate 2453 East 3rd Street, Brooklyn, New York, the Bongiovanni marital residence ("Marital Residence"), as the address of the Debtors' only shareholder. In addition to the items enumerated in Fed. R. Bankr. P. 2002(d)(1), the Trustee gave notice and served papers on all matters arising in these Chapter 11 cases to Bongiovanni Sr. at the Marital Residence. The Marital Residence was literally a repository of hundreds, if not thousands, of papers relating to these Chapter 11 cases.

Under the totality of circumstances, the due process rights of Mrs. Bongiovanni were satisfied by the Trustee. The Trustee provided notice, in accordance with the Bankruptcy Rules, to the Debtors' known shareholder at the Marital Residence. The interests of Mrs. Bongiovanni, to the extent she was a shareholder, did not stand alone, but were aligned with that of her husband, Bongiovanni Sr. And he vigorously represented shareholder interests every step of the way in these Chapter 11 cases.

Mrs. Bongiovanni had no involvement with the Debtors for approximately 10 years before the Chapter 11 filings and for more than 5 years subsequent to the filings. She placed complete trust in her husband in the management of the Debtors and to safeguard her interests. She relied upon his representations as to operations. As an asserted shareholder of family corporations, she cannot be voluntarily blind to their

affairs for 15 years and then surface to claim lack of notice.  As one district court aptly

stated:

> [A] person has no right to shut his eyes
> or ears to avoid information and then say he had
> no notice; it will not suffice the law to remain
> willfully ignorant of a thing readily ascertainable
> when the means of knowledge is at hand.

*Carlton, Fields, Ward, Emmanuel, Smith & Cutter, P.A. v. Boyer (In re U.S.A.*

*Diversified Prods., Inc.*, 196 B.R. 801, 814-15 (N.D. Ind. 1996); s*ee also Wecker v. Nat'l*

*Enameling & Stamping Co*., 204 U.S. 176, 185 (1907) ("[K]nowledge may be imputed

where one willfully closes his eyes to information within his reach.")

## VI.    **Damages**

Even if there was the requisite standing to bring the Motion, and even further

assuming that there was a violation of due process, Bongiovanni Jr. and Mrs.

Bongiovanni failed to prove any damages.  They theorize that if Mrs. Bongiovanni would

have been involved in these Chapter 11 cases, the Trustee would have sold the Properties

earlier at a favorable price, administrative expenses would have been avoided, and

thereby sufficient funds would have been garnered to provide a distribution to

shareholders.  This claim for damages is no more than pure speculation, conjecture and

surmise.  It is not based on any real evidence or the record of these Chapter 11 cases.

The Supreme Court described the type of evidence necessary to support a claim for

damages as follows:

> It is well understood that such evidence must show
> damages to reasonable certainty.  Mere plausible
> anticipation does not merit consideration nor are
> flights into the realm of pure speculation entitled
> to be treated as evidence.  The determination
> of the amount to be allowed as the damage will be

based on evidence which satisfies the mind.

*Conn. Ry. & Lighting Co. v. Palmer*, 305 U.S. 493, 505 (1939) (internal quotation omitted).  Tellingly, at the Evidentiary Hearing, both Bongiovanni Jr. and Mrs. Bongiovanni appeared to recognize the speculative nature of their claim for damages. Mrs. Bongiovanni testified that if she had received notice of the bankruptcy, "[w]e would have closed it up, sold it as is and maybe we would have made a couple of million dollars.  Who knows?"[36] In his closing argument, Bongiovanni Jr. stated, "[l]ast, and in closing, in order to assess any kind of damage, I have to speculate because that's all that's left."[37]

The Properties were sold 14 months after appointment of the Trustee. Considering the circumstances, this was not an inordinate amount of time.  They were sold as expeditiously as possible consistent with the need to address the years of neglect of the buildings, the devising and implementation of a prudent marketing program, and in the face of lack of cooperation, and often times, outright interference with management of the Properties by Bongiovanni Sr. and his opposition to motions and applications filed by the Trustee.

The Trustee could not ignore the New York City Housing Code violations and was required to make the repairs to the Properties imperative to public health and safety and ultimately the sale process.  The Trustee's efforts bore fruit and resulted in a sale for significantly more than the scheduled or appraised values of the Properties.  The price of $13.1 million was sufficient to pay in full all allowed secured claims, allowed priority claims and general unsecured claims, without interest.  The Trustee did not hold on to the

---

[36] Tr. at 51:21-23.
[37] Tr. at 127:23-24.

Properties any longer than necessary and, together with her former counsel and other retained professionals, worked hard to obtain the highest possible price.  The Trustee exercised sound business judgment in her handling of the Properties and fulfilled her fiduciary duty to maximize the value of estate assets.

**VII.    <u>Conclusion</u>**

At great expense to these Chapter 11 estates, Bongiovanni Sr. waged a senseless war against the Trustee.  He lost the battle.  Upon his passing, his son and wife have opted to wage the same war once again.  At its core, the Motion is little more than an attempt to unravel these Chapter 11 cases by means of an impermissible collateral attack on final orders of this Court authorizing the sale of the Properties, confirming the Plan and awarding compensation to the Trustee and her counsel.

Based on all of the foregoing, the Motion is denied in its entirety.

**AN ORDER CONSISTENT WITH THIS DECISION
SHALL BE ENTERED SIMULTANEOUSLY HEREWITH**


Dated: Brooklyn, New York
       July 30, 2008

<u>s/Jerome Feller</u>
Jerome Feller
United States Bankruptcy Judge